WEBSTER, J.
 

 In this direct criminal appeal, appellant claims that the trial court committed reversible error in denying his motions (1) to suppress his statements to two Jehovah’s Witnesses based on the clergy communications privilege; (2) to suppress his statements to a jailer, a map drawn by him, and all evidence recovered based on the map; (3) for judgment of acquittal on the charge of first-degree murder because there was insufficient evidence of premeditation; and (4) for judgment of acquittal on the charge of tampering with evidence because there was insufficient evidence of a pending or imminent investigation. We affirm the denial of appellant’s motion for judgment of acquittal as to both charges without further discussion. For the reasons that follow, we also affirm the denial of appellant’s motion to suppress.
 

 I.
 

 A.
 

 On November 7, 2007, the victim, appellant’s 79-year-old mother, was reported missing after she failed to keep her scheduled appointments as a real estate agent. Appellant, who lived with the victim, told the sheriff that his mother left with a man in a dark-colored pickup truck. Deputies searched the immediate area and gained access to the victim’s truck, which contained the victim’s driver’s license, credit cards, cell phone, business cards, appointment book and money. The following day, law enforcement from several agencies and volunteer searchers with dogs began searching the victim’s 22-acre property and the surrounding area. At approximately noon, appellant agreed to talk with two investigators at the sheriffs office about the possible whereabouts of the victim. Appellant specifically was told that he was not under arrest. Eventually, appellant conceded that he made up the story about the victim leaving with a man in a pickup truck. After three hours of questioning, appellant said that he wanted a lawyer, and the interview ended. Appellant was arrested on an unrelated charge of possession of a firearm by a convicted felon, and was held in the county jail on that charge.
 

 On November 11, 2007, while he was still in custody on the firearm charge, appellant motioned for two elders of the Jehovah’s Witnesses, Joseph Westbrook and Michael Prentice, to come over to his holding cell. After receiving permission, West-brook and Prentice entered the cell, and Prentice asked appellant what was wrong. Appellant told them that his mother had been killed, “they were trying to pin it on him,” and he “messed up” by disposing of the body. Appellant explained that he had been drinking for days and, when he came home after working on his tractor, he
 
 *798
 
 found his mother lying in a pool of blood with no pulse. When appellant said that he did not want to talk about it anymore, Prentice quoted scripture about the resurrection. According to Westbrook, appellant did not indicate that he was seeking spiritual counseling and guidance and did not want to talk about the Bible or pray. Westbrook and Prentice left appellant’s cell and told Deputy Law what appellant had said. Law told them that appellant’s mother was missing and presumed dead, that they could not find the body and that, if appellant was talking, they should go back and talk to him. They went back, and Westbrook told appellant to “tell them where the body is because then the forensic evidence should be able to clear you and show your innocence.” Appellant was quiet for a while and then said that he needed to talk to a lawyer. Westbrook brought up the resurrection again, asked appellant if he wanted to see his mother again, and referred to the Bible where Jesus said, “All of those in memorial tombs would come out.” Westbrook noted that appellant seemed receptive to this message. Westbrook asked if appellant wanted his mother to have a decent burial, and urged him to “tell them where she’s buried.” Appellant responded that his mother was not buried, but was “on top of the ground” on the farm, in bones or in pieces. Appellant again said that he wanted to talk to a lawyer. The two elders then left and were asked to write a statement about what appellant had said. On the issue of confidentiality, Westbrook explained that Jehovah’s Witnesses believed that if they had knowledge of a crime and did not disclose it, they would be “a sharer in that.”
 

 Shortly after he spoke to the Jehovah’s Witnesses elders, appellant motioned for one of the jailers, Officer Golub, to come to his cell. Appellant asked Golub his name and said, “It was an accident.” Golub asked, “What was an accident?” Appellant responded, “Mother.” Appellant went on talking, saying that he was “F’ed up,” that her bones were in a field and the rest was in the flower beds, that it was an accident, that he did not mean for it to happen, and that he burned her and spread her out in the field. Appellant described the location of the field, but Golub could not understand the field’s location and placed a pen and paper on appellant’s bed. Appellant drew a map, and Golub called the sheriff. Golub acknowledged that he was aware that appellant was in jail on a firearm charge, that appellant had been questioned about his mother’s disappearance, and that a massive search for her body was being conducted while appellant was in jail. The map drawn by appellant was taken to the sheriff, who took a cadaver dog to the area, where the dog alerted to bones on the surface. According to the sheriff, the area would have been searched even without a map, and the bones were in plain view and would have been found eventually.
 

 B.
 

 On March 28, 2008, appellant was indicted for first-degree murder, abuse of a dead human body and tampering with evidence. Prior to trial, appellant filed a motion to suppress (1) his statements to the two elders of the Jehovah’s Witnesses based on the clergy communications privilege; (2) his statements to Officer Golub after he invoked his right to an attorney; (3) the map drawn by him; and (4) all evidence recovered based on the map. After holding a hearing, the trial court denied the motion to suppress, concluding that appellant’s statements to the Jehovah’s Witnesses elders were not subject to the clergy communications privilege because (1) appellant’s conduct demonstrated that he was not seeking spiritual counsel from the
 
 *799
 
 elders, but was merely trying to get someone to listen to his side, and (2) the elders did not qualify as members of the clergy. The court also concluded that the statements initiated by appellant to Officer Go-lub, while appellant was in custody on an unrelated offense, were not subject to suppression and that the victim’s remains inevitably would have been discovered.
 

 At the conclusion of appellant’s trial, the jury returned a verdict finding appellant guilty on all three counts as charged. Appellant was sentenced to life in prison ■without parole on the murder count, followed by concurrent sentences of fifteen and five years in prison on the remaining counts. This appeal follows.
 

 II.
 

 A.
 

 Appellant claims that the trial court committed reversible error in denying his motion to suppress his statements to the Jehovah’s Witnesses elders based on the clergy communications privilege. Pursuant to section 90.505(2), Florida Statutes (2007), “[a] person has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication by the person to a member of the clergy in his or her capacity as spiritual adviser.” For the clergy communications privilege to apply, four requirements must be satisfied: (1) the communication must be made to a “member of the clergy,” as defined in the statute; (2) the statement must be “made ... for the purpose of seeking spiritual counsel and advice”; (3) the information must be received “in the usual course of [the clergy member’s] practice or discipline”; and (4) the communication must be “made privately,” and “not intended for further disclosure except to other persons present in furtherance of the communication.” § 90.505(l)(b), Fla. Stat. (2007);
 
 Nussbaumer v. State,
 
 882 So.2d 1067, 1074 (Fla. 2d DCA 2004).
 

 The trial court found that appellant’s statements to the elders failed to satisfy the first two requirements. On appeal, the state concedes that one could “reasonably believe” that Jehovah’s Witnesses elders qualify as members of the clergy. Assuming for the sake of argument that the elders were members of the clergy, we agree with the trial court that appellant’s statements to the elders were not made “for the purpose of seeking spiritual counsel and advice.” When reviewing the trial court’s denial of a motion to suppress, we must interpret the evidence and all reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.
 
 Pagan v. State,
 
 830 So.2d 792, 806 (Fla.2002). According to elder Westbrook, appellant did not indicate that he was seeking spiritual counseling and guidance and did not want to talk about the Bible or pray. The trial court could conclude that appellant’s words and actions indicated that he was not seeking spiritual advice or counseling, but was trying to explain his side of the story.
 

 Although not addressed by the trial court or the parties on appeal, we also believe that the evidence failed to establish that appellant’s communications were either “made privately” or “not intended for further disclosure except to persons present in furtherance of the communication.” First, the conversations took place in a jail holding cell, which is not usually considered a place for private communications. Furthermore, it is clear from elder West-brook’s testimony that he did not consider the conversations with appellant to be confidential, and there was no testimony that Westbrook told appellant that the conversations would be confidential. In fact, the exchange between appellant and the elders
 
 *800
 
 resembled an interrogation, with the elders repeatedly encouraging appellant to tell the authorities where his mother’s body was buried and appellant repeatedly telling them that he needed to talk to a lawyer. Accordingly, we conclude that the trial court correctly found that appellant’s statements to the elders were not subject to the clergy communications privilege.
 

 B.
 

 Appellant also claims that the trial court committed reversible error in denying his motion to suppress his statements to Officer Golub, the map he drew for Golub, and all evidence recovered based on the map. Appellant asserts that, because he had previously invoked his Fifth Amendment right to counsel pursuant to
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Officer Golub could not “interrogate” him at the jail, even if appellant initiated the contact, unless appellant knowingly and intelligently waived his right to counsel which, at a minimum, required appellant to be advised of his
 
 Miranda
 
 rights.
 
 See Davis v. State,
 
 698 So.2d 1182, 1189 (Fla.1997) (holding that a police officer who interviewed the defendant in jail after reinitiation of contact by the defendant, who had initially invoked his right to counsel, was required to first administer
 
 Miranda
 
 warnings). However, “[i]t is well established that
 
 Miranda
 
 warnings apply only to custodial interrogations.”
 
 State v. Edenfield,
 
 27 So.3d 222, 224 (Fla. 2d DCA 2010). The fact that a person makes incriminating statements to a law enforcement officer in jail does not entitle that person to
 
 Miranda
 
 warnings outside the context of a custodial interrogation.
 
 Id.
 
 at 225.
 

 Here, appellant initiated the contact with Officer Golub and said, “It was an accident.” Golub responded, “What was an accident?” Appellant then made the incriminating statements about what he did with his mother’s body. Contrary to appellant’s assertion, Officer Golub did not interrogate appellant when he asked, “What was an accident?” First, it was appellant rather than Golub who initiated the questioning.
 
 Id.
 
 at 224 (noting that the term “custodial interrogation” refers to “questioning
 
 initiated
 
 by law enforcement” after a person has been taken into custody) (quoting
 
 Miranda,
 
 384 U.S. at 444, 86 S.Ct. 1602). Moreover, Golub, as a jailer, was responsible for the security and well-being of the jail’s inmates and could justifiably ask appellant what he meant by “an accident,” which could have referred to any number of things completely unrelated to appellant’s mother. Under the circumstances, a reasonable person could not conclude that Golub’s inquiry in response to appellant’s oblique statement was designed to lead to an incriminating response.
 
 See Ramirez v. State,
 
 739 So.2d 568, 573 (Fla.1999) (“ ‘Interrogation takes place ... when a person is subjected to express questions, or other words or actions, by a state agent, that a reasonable person would conclude are designed to lead to an incriminating response’ ”) (quoting
 
 Traylor v. State,
 
 596 So.2d 957, 966 n. 17 (Fla.1992)). Therefore, appellant’s statements to Golub were not subject to suppression under
 
 Miranda.
 

 The state concedes that Officer Golub should have known that his action in giving appellant a pen and paper on which to draw a map at the end of appellant’s statement would result in an incriminating response. However, we agree with .the state that the admission of the map was harmless because appellant had already made a statement to Golub about the location of his mother’s remains and the evidence recovered based on the map was admissible under the inevitable discovery doctrine.
 
 See Nix v. Williams,
 
 467 U.S.
 
 *801
 
 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (holding that evidence obtained as the result of unconstitutional police conduct may still be admissible provided that the evidence ultimately would have been discovered by lawful means). The victim’s remains, which were scattered in a field on her property, would have been discovered eventually based on appellant’s statement to Golub and the fact that the victim’s property was being combed by search teams with specially trained dogs. Accordingly, we affirm the trial court’s denial of appellant’s motion to suppress.
 

 III.
 

 For the reasons expressed, appellant’s convictions and sentences are affirmed.
 

 AFFIRMED.
 

 LEWIS and MARSTILLER, JJ., concur.