DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

STATE OF FLORIDA,

Appellant,

v.

JUAN MARTIN GONZALEZ,

Appellee.

No. 2D22-3707

_____

January 31, 2024

Appeal from the Circuit Court for Pinellas County; Philippe Matthey, Judge.

Ashley Moody, Attorney General, Tallahassee, and Jonathan S. Tannen, Assistant Attorney General, Tampa, for Appellant.

Frank J. Bane of NOC Legal Services, Tampa, for Appellee.

MORRIS, Judge.

The State appeals the trial court's order granting Juan Martin Gonzalez's motion to suppress in the State's case charging him with lewd or lascivious molestation of a child twelve years of age or older but less than sixteen years of age. Based on the clergy-penitent privilege set forth in section 90.505(2), Florida Statutes (2020), and explained in *Nussbaumer v. State,* 882 So. 2d 1067 (Fla. 2d DCA 2004), the trial court

suppressed statements which Gonzalez made during a church meeting. We hold that the privilege is not applicable to Gonzalez's statements, and we therefore reverse.

## BACKGROUND

Gonzalez and the victim attended the same church. The charge arose from an incident in November 2020, when Gonzalez kissed the victim and fondled her breasts. At that time, Gonzalez was fifty-seven and the victim was twelve. The victim reported the molestation that same night to multiple members of her family, including her grandfather, M.S., her uncle, F.S., and her mother, S.S. M.S. was the pastor of the church which both Gonzalez and the victim attended.

After learning about the incident, M.S. went to Gonzalez's house to discuss the incident with him. Afterwards, M.S. contacted a church "apostle" in Mexico to determine how the church should handle the matter. M.S. decided to resolve the matter by conducting a meeting with the church's local leaders. At that time, the church had approximately eighteen to twenty volunteer leaders who performed various functions at the church. Gonzalez and his wife were two of those leaders.

In preparation for the meeting, M.S. sent an invitation to the church leaders over Facebook Messenger, informing them of an emergency meeting. M.S. told Gonzalez about the meeting in person, telling Gonzalez that he would need to explain to the church leaders the details of what he had done and that he would need to ask for forgiveness.

The meeting was conducted just five days after the incident. There were approximately fourteen to twenty people present, including Gonzalez and M.S. The victim's uncle, F.S., was also present, but the victim's mother, S.S., decided not to attend. M.S. testified that there was

2

"an understanding" that the meeting would be confidential, but he conceded that "it was not directly stated." When asked to describe what was meant by "an understanding," M.S. explained that the church was "trying to deal with the human spiritual aspect" of the matter. F.S. testified that someone at the meeting stated that the meeting was to remain confidential, but he could not remember exactly when that statement was made during the meeting, nor did he remember who said it, though he believed "it would have been the pastor."

The meeting was not initially being recorded, but at some point, F.S. began to record it. F.S. testified that he did not begin recording until about twenty-five minutes into the meeting, and the meeting lasted for over two hours. The video[1] begins with Gonzalez asserting that he would have liked for "her" to be at the meeting so that everyone present could attest that he was sorry for what he did and so that he could apologize to "her." M.S. said something that was inaudible, and Gonzalez turned back toward the audience and stated the following, in relevant part:

> I'll pretend she's here. [S.S.], I ask [S.S.] to forgive me, even
> though she's not present here, but you are, as witnesses,
> because I have sinned. More than anything, I have sinned
> against God, I have disrespected the Pastor as authority of
> this church, and I admit it, but I have hurt [S.S.], I have hurt
> her family, and as I was telling the Pastor, I won't do anything
> against my will. I will just be obedient and will face the
> situation. I'm going to face the situation because it's painful
> when you hurt persons that you really love, [indiscernible]
> that I see are devastated, my family is devastated, and it's sad
> when you shatter those you care the most about, the ones
> you love the most, it's sad. But perhaps in this, God wants to

_____

[1] We note that the participants were speaking Spanish. However, we have a certified Spanish-to-English translation of the transcript contained within our record, and the references to the video refer to that transcript. The certified translation confirms that the statement was addressed to the victim's mother, S.S., rather than to the victim.

show us other things, perhaps we have to learn from the mistakes [indiscernible] and I reiterate to you that I'm here to face the situation. Pastor, I'll . . . you again that if your daughter, [S.S.], wants to take action, stand by her.

Gonzalez continued by affirming that M.S. should stand by S.S. and that Gonzalez was willing to face the consequences of his actions.

At some point, F.S. pointedly asked Gonzalez what he did. Another person present, J.P., stated to Gonzalez that for repentance or forgiveness, Gonzalez had "to say what you did, what was the mistake." Gonzalez then began to describe how the incident occurred, with J.P. asking Gonzalez to specify who was involved and the details of the incident. M.S. also interjected, noting that Gonzalez had not fully described the incident. J.P. again stated that Gonzalez needed to "confess everything" and "say everything that happened." Gonzalez responded that he believed S.S. was going to be present and that everyone else would just be witnesses. But M.S. replied, "No, the thing is that you were going to apologize to everyone, to all the church." Gonzalez then pointed to the camera, noting that F.S. was recording everything.

Eventually, Gonzalez provided details about the incident. M.S. then read aloud a letter from S.S. in which she wrote that the victim told a detective that the incident was not the only time that something inappropriate happened with Gonzalez, detailing a prior occasion when Gonzalez had offered to teach the victim how to kiss. The remainder of the video reflects that M.S. encouraged Gonzalez to repent, telling him that there would be consequences and that the church could not have Gonzalez continue to lead various activities, though the leaders did not want him to leave the church.

Following the meeting, F.S. gave the video to S.S., who then gave it to law enforcement. As a result, Gonzalez was arrested and charged.

4

Gonzalez filed a motion to suppress the video and all references to the meeting, arguing that his statements were privileged pursuant to the clergy-penitent privilege set forth in section 90.505(2).  After the hearing, the trial court granted the motion, concluding that Gonzalez met the requirements for the privilege as set forth in *Nussbaumer*.  This appeal follows.

ANALYSIS

When reviewing a trial court's ruling on a motion to suppress, we must defer to the trial court's factual findings as long as those findings are supported by competent, substantial evidence; however, we apply de novo review to the trial court's application of the law to the factual findings.  *Duke v. State*, 82 So. 3d 1155, 1157-58 (Fla. 2d DCA 2012); *see also Dermio v. State*, 112 So. 3d 551, 555 (Fla. 2d DCA 2013).  Thus we review de novo the trial court's ruling regarding the applicability of the clergy-penitent privilege.

Section 90.505(2) provides that "[a] person has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication by the person to a member of the clergy in his or her capacity as spiritual adviser."  A "member of the clergy" is defined as "a priest, rabbi, practitioner of Christian Science, or minister of any religious organization or denomination usually referred to as a church, or an individual reasonably believed so to be by the person consulting him or her."  § 90.505(1)(a).  In order for a communication to be deemed "confidential," it must be "made privately for the purpose of seeking spiritual counsel and advice from the member of the clergy in the usual course of his or her practice or discipline and not intended for further disclosure except to other persons present in furtherance of the

5

communication." § 90.505(1)(b); *see also Nussbaumer*, 882 So. 2d at 1074 (reciting statutory requirements).

> I.    *Whether the communication was made to a member of the clergy in his or her capacity as a spiritual adviser*

For the privilege to apply, the communication must be made to a member of the clergy who is acting in his or her capacity as a spiritual adviser.  We reject the State's attempt to frame the communication here as being made *only* to S.S. and to the other church leaders.  Having viewed the video and reading the transcript therefrom, we conclude that M.S., Gonzalez's pastor, was among the recipients of Gonzalez's communication and, therefore, that part of section 90.505(2) was met.[2]  However, the privilege requires more than just a statement being made to a member of the clergy.  The dispute in this case centers on the other requirement: that the communication was confidential.  And that part of the test requires that the communication be "made privately for the purpose of seeking spiritual counsel or advice from the member of the clergy in the usual course of his or her practice or discipline and not intended for further disclosure except to other persons present in furtherance of the communication."  § 90.505(1)(b).

> II.    *Whether the communication was made for the purpose of seeking spiritual counsel or advice*

The trial court determined that Gonzalez's communication was made for the purpose of seeking spiritual counsel and advice because Gonzalez was instructed to attend the meeting by M.S. and because the

---

[2] Indeed, because M.S. instructed Gonzalez to apologize "to everyone, to all the church," this necessarily includes M.S., who is the church pastor.  The fact that the video reflects that Gonzalez primarily faced the audience, rather than M.S., who stood to his left when making the communication, does not convince us that M.S. was somehow excluded as a recipient of the communication.

6

meeting was conducted so that Gonzalez could explain what happened and seek forgiveness and redemption through the church.

It is clear from the video and the record that Gonzalez made the communication in order to explain what had happened and to apologize "to everyone, to all the church." This does not automatically render the communication as one made "for the purpose of seeking spiritual counsel and advice." § 90.505(1)(b); *see Elliott v. State*, 49 So. 3d 795, 799 (Fla. 1st DCA 2010) (affirming denial of motion to suppress where trial court determined clergy-penitent privilege did not apply because defendant's communication was made so that he could explain his side of the story to the church elders rather than his "seeking spiritual advice or counseling"); *cf. Magar v. Arkansas*, 826 S.W.2d 221, 222-23 (Ark. 1992) (finding clergy-penitent privilege inapplicable where defendant's admission to minister's accusations of sexual abuse of minors was initiated by minister for disciplinary reasons and not for spiritual counseling).

M.S. testified that the meeting was called to address the "human spiritual aspect" of the matter, and he testified that he gave instructions to Gonzalez about what he was supposed to say for "spiritual recovery." F.S. also testified that the meeting was held for spiritual purposes, but he further stated it was to "resolve the problem." We acknowledge that this case does not involve a communication "with wholly secular purposes." *Nussbaumer*, 882 So. 2d at 1075 (quoting *People v. Carmona*, 627 N.E.2d 959, 962 (N.Y. 1993), and citing *Magar* as one such case). Yet, we reject the argument that a communication which occurs in a church setting and involves seeking forgiveness automatically qualifies it as having been made "for the purpose of seeking spiritual counsel and advice" and that it therefore becomes privileged. Detailing the facts of

7

wrongdoing and asking for forgiveness before a pastor and other church leaders does not mean that the party making the communication was seeking spiritual counsel and advice. *Cf. Nussbaumer*, 882 So. 2d at 1075-76 (concluding that appellant consulted pastor specifically for spiritual counsel and advice where he "wanted to find out if [he] had a problem" and also "wanted Christian counseling" and where substantial portion of counseling sessions were devoted to prayer and Bible study). Further, the record reflects that M.S. called the meeting "to try to resolve this issue as a whole church." A person seeking to enforce the privilege must be seeking spiritual counsel and advice *from a member of the clergy*, but while M.S. met that definition, the "whole church" did not.

M.S. told the other church leaders that "something had happened with [Gonzalez] and that he was going to explain the situation." J.P. testified that her understanding of the purpose of the meeting was that Gonzalez would say something "about what happened that night [that the incident occurred]" and that he would also apologize and seek forgiveness. Gonzalez was told that he had to fully explain his wrongdoing as well as to apologize to everyone in the church. M.S. instructed Gonzalez that he had to fully humble himself and to admit what he did because if he failed to do so, "the Lord doesn't forgive." M.S. also told Gonzalez that "there are consequences, because as I told you . . . we can't have you in basketball, leading." M.S. testified that discipline could be part of resolving the matter within the church, and he later clarified that the purpose of the meeting was to "correct" Gonzalez, though the church wanted to keep Gonzalez and his wife as members of the church. J.P. testified that after Gonzalez spoke, Gonzalez's wife also addressed everyone present at the meeting, followed by other church leaders who discussed the seriousness of the issue.

8

The video reflects that Gonzalez acknowledged that he was making the communication to the church leaders "as witnesses," and he stated that he would "be obedient and face the situation." He also stated that he was there "to face the music, to admit to it, and [indiscernible] deserve a sanction."

When viewed as a whole, we do not construe the video and the suppression hearing testimony as reflecting that the communication was made "for the purpose of seeking spiritual counsel and advice." Significantly, Gonzalez did not initiate the meeting or seek out M.S. for spiritual advice. Rather, it was M.S. who sought out Gonzalez to address the matter, ultimately instructing him to attend the meeting to explain what had happened and to apologize. *Cf. Magar*, 826 S.W.2d at 222-23 ("We find it significant, in this case, that [the pastor] sought out Magar to confront him with allegations of sexual abuse conveyed to him by the parents of two of the victims."). The fact that the meeting was called so that Gonzalez could "explain the situation" and so that Gonzalez could apologize to the entire church also supports the conclusion that the communication was not made "for the purpose of seeking spiritual counsel and advice." Gonzalez himself acknowledged that he was there to "face the music" and to "face the situation," and he agreed that he deserved a sanction. We are convinced then that the purpose of the meeting was to impose church discipline on Gonzalez. *Cf. Magar*, 826 S.W.2d at 222-23. Accordingly, the trial court erred by finding that Gonzalez's communication was made for the purpose of seeking spiritual counsel and advice.

III.    *Whether the communication was made in the usual course of a clergy member's practice or discipline*

The trial court determined that the communication was made to M.S. in the usual course of his or her practice or discipline in part

9

because M.S. organized the meeting and because "everything that unfolded that day in that church was done according to his plan." The trial court continued by finding that Gonzalez's church permits its members to confess their wrongdoing before a gathering of church leaders whereby the member "seeks repentance and confession and forgiveness in a more overt manner within the privacy of the four walls of their church."[3] The trial court found that the fact that the meeting was videotaped was irrelevant.

We disagree with the trial court's ruling on this issue. The purpose of this "requirement is to expand the scope of the privilege so that it is not limited only to those religious traditions that require formal confession." *Nussbaumer*, 882 So. 2d at 1076. "[T]he modern trend is to interpret it as requiring only that the confider consulted the clergy member in his or her professional capacity." *Id.*

However, the relevant question is what Gonzalez sought rather than how M.S. addressed the situation. *See Nussbaumer*, 882 So. 2d at 1077 (explaining that for purposes of determining whether the pastor was acting in his usual course of practice or discipline, "the relevant inquiry is what [the confider] sought rather than the nature of [the pastor's] response"). And in this case, Gonzalez did not seek out M.S. in

---

[3] We note that within his brief and at oral argument, Gonzalez's counsel referenced both the Establishment Clause and the Free Exercise Clause of the United States Constitution, and he noted the confession process that occurs within the Catholic Church. To the extent that Gonzalez is impliedly asserting that he should be treated no differently than a parishioner of a Catholic Church for purposes of determining whether he was entitled to enforce the clergy-penitent privilege, we agree. It is clear from the transcript of the suppression hearing that the trial court was very careful to recognize Gonzalez's church's right to practice its faith without making any distinction between it and other churches and/or religions. We likewise make no such distinction.

10

his capacity as a pastor. Rather, it was M.S. who sought Gonzalez out to confront him about what had occurred. Further, it was M.S. who called the meeting and instructed Gonzalez to attend so that he could explain what had happened and so that he could apologize to the entire church. There is simply no testimony that Gonzalez sought out M.S. in his professional capacity.

There was also no testimony that when a church member commits a crime against another church member (or any type of wrongdoing), the offending member is required—in the usual course of the pastor's practice or discipline—to appear before church leaders and the victim's family (via video or otherwise) to explain what had happened and to apologize. In fact, M.S.'s own testimony rebuts such a conclusion. M.S. testified that he contacted an apostle of the church who lived in Mexico to seek guidance on how to resolve the issue. He testified that he called the apostle to see what his experience had been in a different case, and M.S. "followed some instructions from him to continue on." Ultimately, M.S. made the decision to conduct the "urgent meeting" with the other church leaders. He testified that some church leaders knew what the meeting was going to be about but that others did not.

We conclude that the meeting conducted in this case was not part of M.S.'s usual course of practice or discipline. If it had been, it would have been unnecessary for M.S. to contact the apostle to ask him about his own experience in a different matter. It also would have been unnecessary for M.S. to follow the apostle's instructions on how to proceed. Further supporting this conclusion is the fact that the meeting was urgent in nature and the fact that not all of the church leaders were even made aware of the basis for the meeting. The absence of any clear testimony that Gonzalez sought out M.S. in his capacity as a pastor or

11

that the type of meeting involved in this case was part of M.S.'s regular duties leads us to conclude that the trial court erred by finding that the communication was made to M.S. in the usual course of his practice or discipline. *Cf. Nussbaumer*, 882 So. 2d at 1076-77 (explaining that where pastor testified that counseling sessions were conducted at the church itself or in a church office and that his regular duties included pastoral counseling, it was clear that appellant's communications to the pastor "were made in the usual course of the pastor's practice or discipline").

IV.     *Whether the communication was made privately and not intended for further disclosure except to other persons present in furtherance of the communication*

The trial court determined that the communication was made privately and not intended for further disclosure despite the facts that the other church leaders were present and that Gonzalez addressed some of his comments to S.S. via the video. The trial court concluded that the other church leaders were invited to the exclusion of other church members and that they furthered Gonzalez's communication seeking forgiveness and redemption. The trial court also concluded that based on F.S.'s testimony, there was, at some point, a representation made that the meeting would remain confidential. The trial court did not address the fact that Gonzalez addressed S.S. via the video, though the trial court found that whether or not Gonzalez saw that he was being videotaped was not evidence that he knew that the video was going to be turned over to S.S. who would then turn it over to law enforcement.

We disagree that the communication was made privately and not intended for further disclosure except to those present at the meeting. The law revision council notes appended to section 90.505 reflect that the legislature intended to limit the privilege's applicability only to certain

12

situations where confidentiality was expected. § 90.505, L. Rev. Council Note (1976); *see also Guerrier v. State*, 811 So. 2d 852, 854 (Fla. 5th DCA 2002) (recognizing that evidentiary privileges which did not exist under common law are generally disfavored and strictly construed (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. KPMG Peat Marwick*, 742 So. 2d 328, 331 (Fla. 3d DCA 1999))). Where the person asserting the privilege made the communication "in the presence of third parties not necessary to the furtherance of the communication or under circumstances where confidentiality cannot be expected, *e.g.*, in public facilities or large groups," the communication is not privileged. § 90.505, L. Rev. Council Note (1976); *see also Nussbaumer*, 882 So. 2d at 1078-79.

Here, Gonzalez did not make the communication solely to his pastor, M.S. Rather, the communication was also made expressly to the assembled church leaders and, through the video, to S.S. The video and the record reflect that Gonzalez was there to explain what had happened and to apologize. While there was testimony that the church leaders were called to the meeting to further Gonzalez's seeking of forgiveness "in a spiritual context," we are not persuaded that the comments made by some of the church leaders present, prompting Gonzalez to explain details of what happened, constitute "furtherance of the communication" between Gonzalez and M.S. Nor are we persuaded that S.S.'s future viewing of the video would somehow further the communication. The church leaders and S.S. were recipients of the communication and were included within the scope of who Gonzalez was required to confess and apologize to, but the privilege is not applicable simply because a member of the clergy directs a penitent to apologize or to explain the nature of his or her wrongdoing to church leaders and/or members of the church.

13

The record is clear that Gonzalez was directed to apologize "to everyone, to all the church" and that M.S. called the meeting in order to resolve the issue as "a whole church." We will not look beyond the plain meaning of those words in order to apply a strained interpretation regarding the intended audience. The entire church was not present for the meeting, and thus Gonzalez would not have been able to apologize "to all the church" unless his communication was disclosed to them at a later time. Although the meeting was not initially being recorded, Gonzalez became aware that it was being recorded at some point, yet he did not ask to stop the meeting nor did he ask for clarification as to the confidential nature of the meeting or as to who would receive the video. Instead, he continued with his statements. Additionally, Gonzalez directed some of his comments to S.S., who he acknowledged was not present and, from the record before us, does not appear to have had the ability to respond while the video was being recorded.[4] Thus she was unable to further the communication. There is simply no credible argument then that Gonzalez made his communication privately without intent for further disclosure beyond those present at the meeting in furtherance of the communication where he was instructed to apologize "to everyone, to all the church," where he knew at some point that the meeting was being recorded, and where he specifically addressed S.S., who he acknowledged was not present at the meeting. *Cf. Nussbaumer*, 882 So. 2d at 1079 (concluding that the confider made his communication privately and that it was not intended for further disclosure where there were no third persons ever present during

---

[4] There is nothing in our record to indicate that the video was being livestreamed or that S.S. was on a video platform that would have allowed her to respond to Gonzalez.

14

counseling sessions with the pastor, where there was no evidence of the confider's intent for the information to be disclosed to anyone else, and where the pastor had assured him that their conversations would be private and confidential).  Thus, we conclude that the trial court erred in determining that the statements were made privately and not intended for further disclosure beyond those present in furtherance of the communication.

## CONCLUSION

The trial court erred in determining that Gonzalez met the requirements set forth in section 90.505, thereby entitling him to assert the clergy-penitent privilege.  Accordingly, we reverse the order granting Gonzalez's motion to suppress.

Reversed and remanded for further proceedings.


LUCAS and SMITH, JJ., Concur.

_____

Opinion subject to revision prior to official publication.